STATE OF MARYLAND *vs.* ALEXANDER MILBURN AND OTHERS.
*June* 1850.

It is a general rule in the interpretation of legislative acts, not to construe them to embrace the sovereign power of government, unless expressly named or included by necessary implication.

The general words of a statute ought not to include the government, or affect its rights, unless the construction be clear and indisputable upon the text of the act.

In construing statutes, the real intent, when ascertained, will always prevail over the literal sense of the terms. If the words do not exclude doubt, the intention is to be collected from the occasion and necessity of the law.

It was not the intent of the legislature, by the act of 1845, ch. 193, to avoid bonds, *given directly to the State,* unless they were stamped, and the State may maintain an action on such a bond, although it be not on stamped paper.

APPEAL from *St. Mary's* county court.

In this case an action of debt was instituted by the State upon the bond of *Alexander Milburn,* (given by him and his sureties, the other appellees,) as collector of the State tax in *St. Mary's* county for the year 1846. The bond is dated the 29th of April, 1846, and recites, that said *Milburn* had been appointed collector of the State tax in said county for the year 1846, by the commissioners of said county, and is conditioned for the faithful performance of his duties as such collector. Upon this bond was the following endorsement :

"May 4th, 1845. The commissioners of *St. Mary's* county approve of the within bond and securities, and order the same to be recorded. *Geo. J. Spalding,* cl'k.'' Also the endorsement of the recording on the 5th of May, 1846.

The defendants craved oyer and pleaded :

1st. Performance, by the said *Alexander Milburn,* of the conditions in said bond.

2nd. That said bond was not signed, sealed, delivered and approved, until the 4th of May, 1846, and that the paper on which said bond was written, was not at the time of its said execution, delivery and approval, nor has been since that time, duly stamped, as required by law.

14     v.9

3rd. That at the time the said *Alexander Milburn* was appointed, by the commissioners of *St. Mary's* county, the collector of the State tax for the year 1846, to wit, on the 4th of May, 1846, the said commissioners had no legal power or authority to make said appointment.

4th. That said commissioners failed and omitted to make a legal levy of the State tax for the year 1846 in said county.

5th. That at the time said obligors respectively signed their names to said bond, said bond was in blank as to date, and was signed in blank by the said obligors, at different times and places, and that the date in said bond was subsequently written there by a third party, without their knowledge and consent.

6th. That until the said 4th of May 1846, the said bond was never delivered, but until that period was an *escrow;* and that on the said day of its delivery, the said commissioners had no legal power to approve the same.

7th. That the said commissioners did not, at the time they met, for the purpose of levying taxes for the use of said county for the year 1846, impose an assessment or tax for the use of the State.

The State replied by way of traverse to the 1st, 4th and 7th pleas, and on these pleas issues were joined. To the 2nd, 3rd, 5th and 6th pleas, the State entered a general demurrer, to which there was a joinder by the defendants.

The court sustained the demurrer to the 3rd, 5th and 6th pleas, but overruled the demurrer to the 2nd plea, and gave judgment for the defendants, from which the State appealed.

The cause was argued before DORSEY, C. J., SPENCE, MAGRUDER, MARTIN and FRICK, J.

RICHARDSON, attorney general, and HILLOWAY for the State, contended:

That bonds executed to the State by the collectors of the State tax, are not required to be stamped under the act of 1845, chap. 193; that it was not the *intention* of the legislature, in passing said act, to require a stamp on bonds executed *directly*

to the State, and which were to enure to the benefit of the State. That said act being in general terms, no rights of the State can be affected by it; that the State cannot be divested of any right which is an incident to her sovereignty, unless it is specially divested by the express and positive terms of a statute.

MEREDITH and CAUSIN, for the appellees, insisted :

1st. That the act of 1845, chap. 193, requiring bonds with collateral condition to be stamped, makes no exception of bonds given to the State, and in its terms embraces any bond, no matter to whom given, and thus includes collectors' bonds, as well as those of trustees, sheriffs or executors.

2nd. That the well established rule for the construction of statutes is, that the intention of the legislature, gathered from the statute, is to govern and determine its meaning, and the object of the law may be resorted to for elucidation of doubt; that applying this rule, the court can find no warrant, either in the object of the law, (to relieve the pressure of direct taxation on property, by indirect aid,) or the design of the legislature, (to realise as large a sum as practicable from this source;) for excluding from the operation of the stamp tax law, the very persons, who alone derive a direct benefit from its imposition, to wit, the collectors of the tax themselves.

FRICK, J., dissented, and delivered the following opinion, in which DORSEY, C. J., concurred.

This action is instituted upon a bond given to the State of *Maryland,* by a collector of the State taxes and his sureties, the present appellees.

Several pleas were filed to the action below, to some of them an issue was tendered by the plaintiff, to others the State, by its attorney, demurred. The principal and the only important question, however, for the decision of this court, arises upon the second plea, which asserts, that the plaintiff ought not to maintain this action; "because the said writing obligatory was not signed, sealed and delivered, and approved until the 4th of May, 1846, and that the paper upon which the said writing

State *vs.* Milburn, *et al.*—1850.

obligatory is written, was not at the time of said execution, delivery and approval, nor has it since, *been duly stamped*, as required by law."

The demurrer of the plaintiff to this plea was by the court below overruled, and is now before this court upon the appeal. In support of the appeal the appellant contends, that bonds executed to the State by the collectors of the State tax, are not required to be stamped under the act of 1845, ch. 193; that it was not the intention of the legislature in passing that act, to require a stamp on bonds directly to the State, and which were to enure to the benefit of the State; that the act being in general terms, no rights of the State can be affected by it; that of any such right, which is incident to her sovereignty, the State cannot be divested, unless by the express and positive terms of the statute.

This presents a question of delicacy and importance, both in its operation upon the revenue system of the State, and upon her immunities and privileges as a sovereign power in the exercise of her sovereignty. It will not be denied nor can it be questioned, that the State has such privilege and preeminence over the citizen as is here asserted. Under the doctrine of prerogative, "*semper præsumitur pro rege*," this preference or exemption in favor of the sovereign power in the State, wherever it may be found to reside, and in whatever form, is conceded, and is in no sense obnoxious to the principles and spirit of our institutions. It is, on the contrary, a necessary incident to sovereignty in every government, based upon sound policy, and creates the exception in favor of the State to those general rules that are established for the rest of the community. It constitutes a branch of the common law, which, by the third article of the bill of rights, is adopted, "so far as it is not inconsistent with the principles of that instrument and the nature of our institutions." 5 *H. & J.*, 317, 358, 392, 401. Under these general terms, used in the declaration of rights, it has been uniformly recognised as the law of our courts. It has always been asserted as a right of preference in the State in the distribution of the property of a debtor, in the settlement of

the estates of deceased persons, and in various instances where the State is a creditor, or a party, and is entirely consistent with the spirit and principles of our political institutions, as a necessary attribute of the authority in which the rights of sovereignty, the *jura summa imperii*, reside. Conforming to this sovereign prerogative, the State is not to be restrained of any right she had before, by the general words of a statute, but must be distinctly designated as within the intent and provisions of such statute. Not that it is imperative that the State should be named, but it should plainly appear from the language used, that the State itself was in contemplation of the legislature, in passing the statute. See *United States vs. Hoar, 2 Mason*, 314. Without being specially named, the State may, by necessary implication, be included in a law general in its character and enactments. In the case of the *United States vs. Knight*, 14 *Peters*, 315, the general rule is stated, that where any prerogative right or interest is divested or taken from the king, he is not bound, unless he be expressly named, *"or what would be equivalent*, unless the language is such as to show clearly that such was the intent of the act."  And the principle is stated as one decided in *New York, Massachusetts, Pennsylvania*, and no doubt in other States, not upon the notion of prerogative alone; for although so designated, yet the immunity is placed more properly upon the great principles of public good and public policy, alike applicable to all governments, and alike indispensable to their efficient operation. " It is a general rule," says *Judge Story*, in 4 *Mason*, 431, " in the interpretation of legislative acts, not to construe them to embrace the sovereign power of government, unless expressly named or included by necessary implication."

The question is therefore one of intention; and resolves itself into the inquiry, whether the legislature whose will indicated by its laws, directs the policy of the State, designed to include her within the provisions of this law? and whether such intention may be clearly deduced from language expressly used, or inferred, by necessary implication, from the whole tenor and character of the law?

It is important to bear in mind that this is a revenue measure; one of those that constitute a part of the whole system, devised by the legislature to relieve the burden of debt weighing upon the energies of the State; and imports on its face to be "An act to aid in paying the debts of the State."

From the tenor of the original act of 1844, sec. 1, as well as from the character of the bonds and obligations embraced by it, it would seem that the legislature regarded the tax imposed by it, as one to be paid by the obligor, or necessarily falling on him, by the express exemption of bonds *given by* the State, from its operation; that "nothing in the act contained shall be construed to charge a duty, or to require to be stamped, any bond of this State or certificate of debt issued by this State," &c. Here then, in the original act of the legislature, the State is expressly named in the exemption from a duty or charge imposed upon all of her citizens not otherwise excepted. And but for this exception, it is plain the legislature considered the State bound and included by necessary implication within the general terms of the act. By the decision of this court in *Burton et al., vs. The State*, 3 *Gill*, p. 1, it was determined, however, that the words "bonds and obligations," in this act of 1844, were to be restricted to such as are given for the payment of money; and that bonds of trustees, executors and others, conditioned for the faithful performance of their *official* duties, in other words, bonds with collateral condition, were not required to be stamped. Hereupon, and to supply the defect, follows the act of 1845, ch. 193, a supplement to 1844, and intended to embrace that extensive class of bonds, official bonds and all bonds with collateral conditions, which had been excluded from stamp by this judicial interpretation of the act of 1844, and after affixing the rate of tax, proportioned to the penalties of these bonds, incorporates with the act the fifth, sixth, seventh, and eighth sections of the act of 1844, as parts of the act of 1845. In this act no reason existed for an express exemption in favor of the State, when it was not in contemplation, *that the act should impose any tax or charge upon the State.* The bonds here contemplated were to be given *to* the State, not *by*

the State, as under the act of 1844. Within *this* act the State is the creditor, the obligee exacting the bond. The charge of the tax was necessarily, and from all the known relations and analogies between debtor and creditor, upon the debtor or obligor. The act, as a revenue measure, was in favor of the State, and passed "to aid in paying the debts of the State." All that the act requires of the State is, that as a condition to the validity of bonds taken in her name, and in which as obligee she has a direct interest, her official agents before the bond is accepted and approved, should know that the tax levied by the act has gone into the treasury, and this is to be ascertained by the naked inspection of the bond. Having exempted the State as an obligor under the original act, she might well be required in aid of her own revenue, and with only ordinary vigilance, to see that the obligees with whom she treated, had complied with the law. If she neglect this primary duty, through the culpable laches of her agents, she is as much involved in the consequences as any of her own citizens. Under the legitimate construction of this act of 1845, she is, by necessary implication, as much included within the act, as if she had been specially named and designated; and much more clearly so when both acts, considered as one statute *in pari materia*, are taken together, and construed together, for the purpose of discovering the legislative mind. In the original act we have seen that the State is specially named and specially excluded from its operation. Without this exemption, as a revenue measure, when the State was passing thousands of her bonds to creditors at home and abroad, she might, by necessary implication, have been deemed within the provisions of the act of 1844. But the legislature relieved all doubt or question, by conceding her prerogative in words to that effect, so as to repel any implication arising from the terms and the character of the law. When we afterwards turn to the act of 1845, the supplement inseparable from the original, with their several sections and provisions referring to and interwoven with each other, and without which the act of 1845, has no sanctions or penalties, shall it be said, the State is not bound by it, because she is not especially

named in the supplement, when by every intendment and implication of law, she must have been, from the character of the law, distinctly in view of the legislature in passing it? They have said in effect, by fair construction of these two acts of Assembly, we exempt the State from stamps upon her own debts, and her obligations to others, but it is the only exception we make in her favor; since with regard to other contracts where the State is the party obligee, it is her interest and her duty to the revenue, to secure the payment of the stamp by the obligor. Such seems to be the express design upon the face of the two acts, and any other construction would violate the manifest intent of the legislature, and destroy an important feature of State policy, adopted and designed to increase her resources by every sound and practicable revenue measure. Both acts taken together, constitute the so called stamp laws of the State, and "all acts *in pari materia,* are to be taken together as if they were one law, because they are considered as framed upon one system and having one object in view." *Dwarris,* 699.

"The rule for the construction of statutes," says this author on the same page, "is that not only one part of a statute may be properly called in to help the construction of another part, but that it will be inferred or presumed that a number of statutes relating to the same subject, were intended to be governed by one spirit and policy, to be consistent in their several parts and provisions."

It has been objected, that to bring the State within the provisions of this act, would be to place her in a worse position than her citizens, in relation to its provisions. The 8th section of the act of 1844, (incorporated with 1845, as part of the act,) provides in effect that if any of the instruments of writing mentioned shall not be stamped according to the act, or stamped for a lower duty than is chargeable upon it, it shall not be valid or available for any purpose; but that the person or persons *holding* such instrument, upon making oath or affirmation that they were ignorant of the requisitions of the act, or that the instrument was received by them through inadvertance or forget-

fulness, by paying the sum of ten dollars, together with the duty chargeable, may restore the validity of such instrument to all intents and purposes, as if the same had been originally stamped according to the act.

Thus the State in her sovereignty being, as is contended, in no sense the *holder* of the instrument, or a person competent to make the oath, is excluded from the *locus penitentiae* of the act, and can in no way restore the vitality of an unstamped bond, in which she is the obligee and the party in interest.

But the force of this argument is not felt, in view of the fact that some person must necessarily be the custodiary or holder of all such bonds; that some person or persons are designated in every case, whose duty it is to see to its legal execution and approval, in all which a compliance with this act and the requisite of a stamp is included. It is an overstrained construction, to say that such a person for all the purposes of this healing provision of the act is not the holder, as the agent and representative of the State; and if he has committed the laches, is he not competent to repair it by making the affidavit required? Fraud or design to evade the law can in no possible case be imputed to him as the agent of the State. There is no possible motive to invite to it; every thing, on the contrary, to forbid it. As an official of the State, he can have no supposable interest in rendering her securities void or vicious. His duty is one of mere inspection, for the obligor is expected to procure the stamp and to tender the bond in proper form. Any default of the agent of the State, the person for the time being the holder of the bond, must result from ignorance and inadvertence and from no desire to evade the law. What difficulty ought there to be then in conforming to the law, looking to the party who represents the State, in accepting the bond as entirely within the equitable construction of the proviso?

In the present case the bond before the court bears the following endorsement. "May 4th 1845. The commissioners of *Saint Mary's* county, approve of the within bond and securities, and order the same to be recorded. *Geo. J. Spalding* clerk." What difficulty or objection can there be in procuring

from this clerk or either of the commissioners, the required affidavit that the stamp is here omitted inadvertently and with no design to evade the law? There ought to be none; there can be none. And when done, the bond is healed and may be given in evidence; while the officers themselves are relieved from any sinister imputation, that might rest on the good faith and fidelity which is always supposed to attach to the discharge of every public duty.

Otherwise if this objection can be of serious weight it cuts too deep. For in the same category with this bond must be included all bonds, to levy courts, county commissioners, all the bonds of county clerks, registers of wills and others, in which the State has a direct interest and from which she derives a large revenue. All the parties accepting and approving these bonds, must be equally disqualified and excluded from giving vitality to an unstamped bond, and by the same reasoning on the strength of this argument, such bonds (the State having a direct interest in all of them,) must be excluded from the operation of the law.

The whole design of the law must be thus substantially defeated and becomes a nullity; and the legislature in healing the defect of the original law, have passed a supplement absurdly leaving the case, for all practical purposes of revenue, and danger and hazard in the collection of it, worse than it was before. It is not to be reconciled with any just interpretation of this statute, that all bonds to corporations, commissioners and bodies politic of every description, (whether the State is or is not a party in interest,) should not be within the equitable construction of this proviso, and that such obligees are not competent, through the agents who represent them, in accepting such bonds, to heal any defect occasioned by inadvertance or ignorance on the part of such agents, and yet within the strict phraseology of the law, such agent or official may not be properly the holder of the bond. It is entirely consistent with the whole theory of these two acts, that the official bonds to the State should be included within their requisitions. Prior to the present tax system, the State had but little if any

direct interest in collections made through the instrumentality of such bonds. Although the State was in all instances the obligee, and the nominal party, she was to derive no benefit or revenue from them. Under the system as it now exists, she is to some extent directly and beneficially interested in the bonds of clerks, registers, sheriffs, administrators, executors, and in all bonds of a similar character. Each and all the subjects to which these bonds respectively relate, are now matters of revenue to the State, directly or indirectly, and contemplate moneys to be paid into the treasury by the obligors. Exclude these, and the proportion of bonds with collateral conditions, upon which the law could operate would be but small. All other bonds for the payment of money contributed before, under the act of 1844. It is difficult therefore to imagine that the State was not directly and prominently in view of the legislature, and it is hazarding little to say that the whole design of the law of 1845, was to invoke into contribution as a fair and profitable source of revenue this large class of bonds, to which the State was a party in interest.

It is notorious that the charge of executing and tendering such bonds, is uniformly upon the obligors and that they are to be approved by some authority acting for and under the State. Is it asking too much of the State, to require that through these her official agents, she should secure the stamp as essential to its validity, before it is approved and accepted? These same agents of the State would before have rejected, and would now reject the bond, if deficient in *the seal.* How much additional labour is it to inspect the stamp, when looking for the seal, and the other essentials to a good and valid bond? Certainly not enough to cause her representatives to flinch from the duty, when the revenue is to find its way to the State coffers.

This interpretation of these acts, is deemed not only reasonable and consistent with the whole theory of legislation on the subject of stamps, but it would seem to be written upon the face of the acts. In the original act the State is expressly named as a party, and independent of the connection of the supplement by which they are constituted one act, she is a party

State *vs.* Milburn, *et al.*—1850.

from the necessary implication, that if excluded, the *whole design of exacting revenue from bonds with collateral conditions, is materially impaired and the vitality of the act destroyed.*

The result of my examination of these acts of the legislature, and my conclusion drawn from them is, that the demurrer of the plaintiff to the defendant's plea was properly overruled by the court below.

MAGRUDER, J., delivered the opinion of this court.

Milburn, one of the appellants, was appointed the collector of the State tax in *Saint Mary's* county, for the year 1846, and he, with the other appellees, (his securities,) executed the bond on which this suit is brought, for the faithful performance of his duties.

One of the pleas filed in the case, is, that the said writing obligatory, was not signed, sealed, delivered and approved until the 4th of May, 1846, and that the paper upon which said writing obligatory is written, was not at the time of said execution, delivery and approval, nor has it since been, duly stamped as required by law.

To this plea, there was a demurrer by the State, and the same was overruled by the court below, and from that decision, the appeal is taken by the State. Other demurrers filed by the State, were ruled good, and of course from them there is no appeal.

The question really is, whether for the want of a stamp, this action could not be maintained? In reversing the decision of the court below, we do not mean to deny that it is the duty of the proper officers, to take care that bonds of this description, before they are approved, have the requisite stamp. But is the State to be without remedy because of this neglect of duty by the public agents?

The instrument of writing, it is admitted, was signed and sealed, and delivered and approved, but because the paper on which it was written had not the stamp, no action, it is contended, can be sustained upon it.

The act of Assembly 1844, ch. 280, sec. 8, says, that "no instrument of writing whatsoever, charged by this act with the payment of a duty as aforesaid, shall be pleaded or given in evidence in any court of this State, or admitted in any such to be available in law or in equity;" and if this bond had been given to a private individual, no doubt, until it was stamped, a recovery could not be had upon it in any of our courts. But this bond was given to and for the use of the State, and the question is, whether this clause is applicable to such a bond?

If such a question was to arise in any of the courts of England, upon a bond like this given to the king, it can scarcely be doubted that the action could be sustained. "The king may avail himself of the provisions of an act of parliament, but is not bound by such as do not particularly and expressly mention him." To this, it is true, there are exceptions, but none of them will embrace such a case as the one before us. So too in the same author, *(Chitty on Prerogative, ch. 15,)* it is said, "Acts of parliament which would divest or abridge the king of his prerogatives, his interests or his remedies in the slightest degree, do not, in general, extend to, or bind the king, unless there be express words to that effect." This, however, it may be thought, is a prerogative which attaches to the crown, and is not to be claimed by the sovereign power here. This has not been the understanding of the law in the courts of the *United States,* or of sister States. See *4th Cowen,* 143. 18 *John.,* 227. 1 *Watts,* 54. 4 *Mass. Reports,* 528. 2 *Mason,* 314. 4 *Mason,* 427, and other authorities collected by *Judge Hopkinson,* in support of his own opinion, to be found in the *American Law Journal, November* 1849, *p.* 204.

That some of the royal prerogatives of England belong to the State, as branches of the common law, may be seen by reference to the case of *The State of Maryland vs. The Bank of Maryland,* 6 *G. & J.,* 205. Other cases of our own courts might be cited.

In the case of *The People, vs. Rossiter,* 4 *Cowen,* 143, the court remarked, "the people," (here it would be said, the State,) "are not bound by any act of this kind, unless they are named

in it, and the people are the king, for the purpose of this rule.''

This to be sure, is sometimes called a prerogative right, but *Justice Story*, in *2nd Mason*, 312, said, ''it is in fact nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments;'' and founds the rule in the great public policy of preserving the public revenues and property from loss and injury, by reason of the negligence or mistake on the part of public servants.

In the same case he remarked, ''general acts of the legislature are meant to regulate and direct the acts and rights of citizens, and in most cases, the reasoning applicable to them applies with very different, and often contrary force, to the government itself. It appears to me, therefore, to be a safe rule, founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act.'' See also, *1st Kent, (3rd Edition,)* 460

In construing the act or acts of Assembly, now under consideration, we are to gratify the intent of the legislature; to find in these laws the whole meaning, but nothing more than the meaning of the makers of them. '' The real intent, when ascertained, will always prevail over the literal sense of terms? If the words do not exclude doubt, the intention is to be collected from the occasions and necessity of the law.''

Looking at the objects and provisions of these acts of Assembly, it can scarcely be believed that the legislature designed by these laws to deprive the State itself of its right of action against the collector of its taxes and his securities; and this, because, by reason of the carelessness or ignorance of its public agents, the bond required of him, was taken on paper, not stamped.

Indeed the construction here to be combated, would make the law, if not absurd, most unreasonable. If an individual omits to provide a stamp before the execution of the bond, he may afterwards procure it to be stamped, and thereby made

valid by paying the sum of money, and making the affidavit, which the act of Assembly prescribes. This provision is made for the benefit of every other obligee, whose bond is without the necessary stamp. But how preposterous it would be, to require the State to pay to itself the tax imposed, in order to give validity to a bond like that under consideration?

The State is often preferred to individuals; the latter are never preferred to the former. That would be a most absurd construction of these laws, which would secure to any other obligee, (be he citizen or foreigner,) and at the same time to deny to the State the right to make a bond, although not stamped before its execution, evidence in its courts, and yet such would be the case if the notion here combated, be correct, inasmuch as the law has omitted to dispense in any case with the oath, and in the case of a bond to the State, has authorised no person to take the oath for the State. Indeed, as the collector himself furnished the bond already executed, no other person could safely take the oath which is required, and of course if authorised, he would not take it.

"Independently," said the judge, in the *United States vs. Hoar, (2 Mason,)* " of any doctrine founded on the notion of prerogative, the same construction of statutes of this sort ought to prevail, *founded upon the legislative intention.* Where the government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorised to put such an interpretation upon any statute." It could not have been the intent of the legislature to avoid any bond of this description, unless it be stamped. The law has not "plainly said so," and there being no such "clear intention," the court cannot so decide.

Sometimes in acts of Assembly, there is what is called a saving of the State's right, an exception in favor of the State. Such is the case in *England,* but this is only *ex abundanti cautela,* and not of necessity. *Showers Parla. Cases,* 179.

Independently then of the rule of interpretation, which is de-

signed in many (not in all) cases, to exempt the sovereign power from the operation of laws, it would seem to be impossible to find in this law a legislative intention, that bonds of this description, unless with the proper stamp, should not be evidence in our courts.

A majority of the court being of the opinion, that in the judgment of the court below overruling the demurrer to the second plea, there is error.

JUDGMENT REVERSED WITH COSTS, AND
PROCEDENDO AWARDED.